**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| REBECCA BROWN, individually and as parent and guardian of E.C. BROWN, a minor, and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>           v.<br><br>ABBOTT LABORATORIES, INC.,<br><br>           Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 10 C 6674<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Before the court is defendant Abbott Laboratories, Inc.'s ("Abbott") motion to dismiss plaintiff Rebecca Brown's Second Amended Complaint. We grant Abbott's motion in part and deny it in part for the reasons explained below.

## BACKGROUND

On or before September 16, 2010, Abbott discovered beetles and beetle larvae in certain units of Similac-brand powdered infant formula produced at its manufacturing facility in Michigan. (Second Am. Compl. ¶¶ 4, 26-27; see also FDA Press Release, dated Sept. 27, 2010, attached as Ex. B to Def.'s Mem.) Rebecca Brown, a New Jersey citizen, purchased Similac from one of the tainted batches and fed it to her infant daughter on September 19, 2010. (Second Am. Compl. ¶ 37.) Her daughter "began to spit up or vomit

substantially all of the tainted Similac," prompting her to call the child's pediatrician. (Id. at ¶ 39.) Brown learned about the beetle infestation on September 22, 2010, when Abbott announced a voluntary recall. (Id. at ¶¶ 31-34, 39.) She then switched to a different infant formula, and her daughter's "feeding issues immediately disappeared." (Id. at ¶ 39.)

Brown has filed this putative class action on her own behalf and on behalf of her daughter and "all persons who purchased Similac and suffered damages as a result." (Id. at ¶ 40.) In her Second Amended Complaint she asserts ten separate causes of action: negligence (Count I); strict liability (Count II); intentional misrepresentation (Count III); negligent misrepresentation (Count IV); violation of the Illinois Consumer Fraud Act (Count V); violation of the New Jersey Consumer Fraud Act (Count VI); breach of express warranty (Count VII); breach of implied warranty of merchantability (Count VIII); unjust enrichment (Count IX); and violation of the New Jersey Product Liability Act ("NJPLA") (Count X). In Counts I, II, VII, VIII, and X Brown requests the following relief: "compensatory damages, including at least the value of the Similac purchased, damages for pain and suffering, and medical expenses." (See, e.g., id. at ¶ 52.) In Counts III and IV — the negligent and intentional misrepresentation claims — Brown requests only "compensatory damages, including at least the value of the Similac purchased." (See id. at ¶¶ 71, 78.) In Counts V and VI —

the statutory fraud claims — Brown asks us to compel Abbott to pay compensatory, "exemplary," and statutory damages, as well as attorney's fees, into a common fund for the benefit of injured consumers. (See id. at ¶¶ 85, 89.) Finally, in Count IX (unjust enrichment), Brown asks us to compel Abbott to disgorge "all unreimbursed revenue received as a result of the sale of the contaminated Similac products." (See id. at ¶ 109.)

## DISCUSSION

### A.    Legal Standard

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits.    5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004).    To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'    A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 556 (2007)).

### B.    Whether Brown Has Adequately Alleged an Injury Caused by Abbott's Product

Abbott asks us to dismiss the entire complaint, arguing that the alleged connection between Abbott's product and the Brown's

injury is speculative.  (Def.'s Mem. at 3-6.)  Brown alleges that
her infant daughter ingested Similac from a lot infested with
beetles and/or their larvae, causing her to "spit up or vomit" the
formula and interfering with her sleep.  (Second Am. Compl. ¶ 39;
see also id. at ¶ 32 (the FDA warned that consuming tainted formula
could cause "gastrointestinal discomfort").)  The condition was
severe enough that Brown called the child's pediatrician.  (Id. at
¶ 39.)  When Brown learned about the infestation she switched to a
different formula and the problems "immediately disappeared."
(Id.)  It is a plausible inference from these allegations that
Brown's daughter ingested tainted Similac, causing her to become
ill.  It is also possible that Brown's daughter spit up because
infants often spit up, for reasons other than contaminated baby
formula.  As Abbott points out, Brown has not alleged that she saw
insects in the formula that she fed to her daughter.[1]  But having
concluded that Brown's version of events is plausible, we will not
weigh the competing inferences from the complaint's allegations and
decide which version is more likely.  See Swanson v. Citibank, 614
F.3d 400, 404 (7th Cir. 2010) ("For cases governed only by Rule 8,
it is not necessary to stack up inferences side by side and allow
the case to go forward only if the plaintiff's inferences seem more
compelling than the opposing inferences.").  Brown has given

---

[1]  Some of the FDA press releases attached to Abbott's motion refer to
insect "pieces" and "parts," so it is unclear at this point whether the
contamination would be visible in every case.

"enough details about the subject-matter of the case to present a story that holds together." Id. Whether she is ultimately able to prove her case is beyond the scope of Abbott's motion.

**C.   The NJPLA**

The NJPLA imposes strict liability for "harm" caused by a defendant's product:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. § 2A:58C-2. A "product liability action" is "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1. "Harm" means "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." Id.

**1.   Whether Brown Has Alleged "Harm" Within the Statute's Meaning**

Abbott argues that Brown's NJPLA claim is deficient because she has not alleged a "personal physical injury," citing <u>Sinclair v. Merck & Co.</u>, 948 A.2d 587, 595 (N.J. 2008). In <u>Sinclair</u>, the plaintiff sought to recover the cost of medical monitoring to detect latent harm caused by the defendant's Vioxx pain medication. <u>Id.</u> at 589-90. The New Jersey Supreme Court concluded that the phrase "personal physical" in the NJPLA's definition of "harm" modifies "illness," "injury," and "death." <u>Id.</u> at 595 ("[W]e read the injury portion of the definition to require 'personal physical' injury, just like there must be a 'personal physical' illness and 'personal physical' death."). Because the plaintiff in <u>Sinclair</u> did not allege any physical harm, only the possibility that he might suffer physical harm in the future, the court affirmed dismissal of his NJPLA claim. <u>Id.</u> But the court did not, as Abbott seems to suggest, impose some minimum threshold of physical injury or illness below which damages are unavailable. The court merely held that the plaintiff must suffer an actual physical injury or illness. Brown alleges that her infant "began to spit up or vomit" after ingesting Similac and "would not sleep well." (Second Am. Compl. ¶ 39.) Brown has clearly alleged that her daughter suffered a "<u>physical</u> illness" caused by Abbott's defective product.

**2.  Whether or to What Extent the NJPLA "Subsumes" Brown's Other Causes of Action**

The NJPLA "subsumes" all other causes of action for "harm
caused by a product."  See In re Lead Paint Litigation, 924 A.2d
484, 503 (N.J. 2007) ("The language chosen by the Legislature in
enacting the PLA is both expansive and inclusive, encompassing
virtually all possible causes of action relating to harms caused by
consumer and other products."); see also Sinclair, 948 A.2d at 595.
Brown's claims for negligence, strict-liability, and implied
warranty, which are clearly based on harm caused by Abbott's
contaminated product, are subsumed.  See Green v. General Motors
Corp., 709 A.2d 205, 209 (N.J. Super. Ct. App. Div. 1998) ("Under
the [NJPLA], the causes of action for negligence, strict liability
and implied warranty have been consolidated into a single product
liability cause of action, the essence of which is strict
liability."); see also Brown v. Phillip Morris Inc., 228 F.Supp.2d
506, 516 (D.N.J. 2002) (collecting cases dismissing negligence,
strict-liability, and implied warranty claims).  Whether the NJPLA
subsumes Brown's fraud and misrepresentation claims is a closer
question.  The NJPLA clearly subsumes Brown's New Jersey Consumer
Fraud Act claim insofar as it is based upon Abbott's failure to
warn consumers about the infestation and the possible health
consequences of consuming contaminated formula:

> The central focus of plaintiffs' complaints is that
> defendants were aware of dangers associated with lead —
> and by extension, with the dangers of including it in
> paint intended to be used in homes and businesses — and
> failed to warn of those dangers.  This classic
> articulation of tort law duties, that is, to warn of or

to make safe, is squarely within the theories included in
the PLA.  See N.J.S.A. 2A:58C-2.

In re Lead Paint Litigation, 924 A.2d at 503.[2]  Id.  But Brown also
alleges that Abbott made affirmative misrepresentations as a basis
for her NJCFA claim (Second Am. Compl. ¶ 87) and her intentional
and negligent misrepresentation claims (id. at ¶¶ 67, 76).  Some
courts have permitted plaintiffs to pursue "representation-based"
claims on the theory that the misrepresentation itself (not the
product) caused the harm.  See, e.g., New Hope Pipe Liners, LLC v.
Composites One, LCC, Civ. No. 09-3222, 2009 WL 4282644, *3 (D.N.J.
Nov. 30, 2009) ("Since representation-based harms are distinct from
products liability-type harms, the PLA does not subsume those
claims."); Wendling v. Pfizer, Inc., 2008 WL 833549, *6-8 (N.J.
Super. App. Div. Mar. 31, 2008) (concluding that the NJPLA did not
subsume the plaintiff's NJCFA and negligent misrepresentation
claims).

The distinction between harm caused by the product and harm
caused by the product's advertising is reasonably clear in New Hope
and Wendling.  The plaintiff in New Hope received a quote from the
defendants for a particular type of resin that the plaintiff used

---

[2]  See also Sinclair, 948 A.2d at 596 ("The heart of plaintiffs' case is
the potential for harm caused by Merck's drug. It is obviously a product
liability claim.  Plaintiffs' CFA claim does not fall within an exception to the
PLA, but rather clearly falls within its scope.  Consequently, plaintiffs may not
maintain a CFA claim."); McDarby v. Merck & Co., Inc., 949 A.2d 223, 278-79 (N.J.
Super. Ct. App. Div. 2008) (concluding that the NJPLA subsumed the plaintiffs'
NJCFA claim for fraudulently withheld safety information); DeBenedetto v.
Denny's, Inc., 23 A.3d 496, 504-05 (N.J. Super. Law Div. Apr. 23, 201 (aff'd by
DeBenedetto v. Denny's, Inc., 2011 WL 67258, *1, 3 (N.J. Super. App. Div. Jan.
11, 2011)) (similar).

in its "pipe lining" business. <u>New Hope</u>, 2009 WL 4282644, *1.  The defendants later told the plaintiff that the price for the resin had increased, but offered the plaintiff a substitute resin at the quoted price. <u>Id.</u> The defendants represented that this substitute resin was suitable for the plaintiff's business. <u>Id.</u> Relying on that representation the plaintiff purchased the substitute resin only to later discover that it was not suitable, causing plaintiff to "repair or replace many pipe lining runs." <u>Id.</u> Although the plaintiff also alleged that the product was defective, (<u>id.</u> at *4), its NJPLA and fraud claims were independent: the plaintiff might fail to prove that the product was defective, but still recover for the defendants' misrepresentation that the product was suitable for plaintiff's purposes.  In <u>Wendling</u>, the plaintiffs alleged that "the advertisement for defendant's veterinary product, Strongid C, was false and misleading because it stated that it would 'prevent and control parasites every day,' but it did not prevent or control tapeworms, a type of parasite, that infested and eventually killed their horse." <u>Wendling</u>, 2008 WL 833549, *1.  The plaintiffs did not allege that the product was defective, or even that it harmed the plaintiffs' horse. <u>See</u> <u>id.</u> ("Plaintiffs have not alleged product defect or even that Strongid C was not reasonably fit for its intended use because of inadequate warnings.").  Rather, the plaintiffs alleged that the defendant had misrepresented which medical conditions the drug was designed to treat. <u>Id.</u>

Disentangling Brown's misrepresentation claims from her products-liability claim is more difficult. Abbott advertises Similac Isomil Soy (the particular brand Brown purchased) "to parents seeking to '[c]omfort [their] baby's fussiness and gas'," and further states that the product is "specially designed with the gentleness of soy to soothe the tummy." (Id. at ¶ 23.)[3] According to Brown, between September 16, 2010 (when Abbott discovered the infestation) and September 22, 2010 (when it announced the recall) Abbott knew that these statements were false because it knew that ingesting contaminated formula could result in "gastrointestinal discomfort." (Id. at ¶¶ 67, 76.) Without Brown's allegation that the Similac was defective, there would be no misrepresentation.[4] Morever, Brown does not allege that Abbott intentionally conceived of and disseminated the challenged representations intending to deceive consumers. Rather, Brown alleges that Abbott discovered a defect that was arguably inconsistent with statements that Abbott had already made in the marketplace about the product. (See id. at ¶¶ 27-29.) Its duty, at that point, was to withdraw the product

---

[3] Some of the other representations that Brown cites are not even arguably misleading: Similac is the "#1 brand fed in hospitals," and contains "calcium for strong bones," "nucleotides to help support the immune system," "prebiotics to help promote digestive health," "carotenoids naturally found in breast milk." (Second Am. Compl. ¶ 2.) And others are puffery: "[a] baby's first year is so important, so count on Similac for nutrition you can trust" and "Moms can count on [Similac] for trusted nutrition and the formula that's right for their babies." (Id. at ¶ 19.)

[4] Brown has not alleged, for example, that the Similac she purchased was not "designed . . . with soy" or that soy-based formulas are not more "gentle" than other types of formula.

from store shelves and warn consumers that the products they had already purchased may be contaminated. "This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA." <u>See</u> <u>In re Lead Paint Litigation</u>, 924 A.2d at 503.

Brown also argues that her non-NJPLA claims are not subsumed because she has alleged an economic loss — the lost value of the product itself — that is expressly excluded from the NJPLA's coverage. <u>See</u> N.J.S.A. § 2A:58C-1 ("Harm" means "(a) physical damage to property, <u>other than to the product itself</u> . . . .") (emphasis added). The law in this area is somewhat unclear. <u>Compare</u> <u>Estate of Edward W. Knoster v. Ford Motor Co.</u>, 200 Fed.Appx. 106, 116 (3d Cir. Sept. 6, 2006) (Permitting the plaintiff to pursue a NJCFA claim for harm <u>to</u> the product in conjunction with a NJPLA claim for physical harm caused <u>by</u> the product.); <u>with</u> <u>Fellner v. Tri-Union Seafoods, LLC</u>, No. 06-0688, 2010 WL 1490927, *5 (D.N.J. Apr. 13, 2010) (Dismissing the plaintiff's NJCFA claim: "[t]he fact that Plaintiff, here, seeks economic damages to reimburse her for the cost of the product (in addition to personal injury damages) does not change the fact that this is, in essence, a product liabilities claim."); <u>and</u> <u>O'Donnell v. Kraft Foods, Inc.</u>, No. 09-4448, 2010 WL 1050139, *3 (D.N.J. Mar. 18, 2010) (Dismissing NJCFA claim where the plaintiff sought only

the cost of the allegedly defective product, not "physical" harm).[5]
However, we can decide Abbott's motion without reconciling these
authorities. Brown alleges that Abbott offered to refund Similac
purchases provided that "the purchaser still has the lot number
from the tub containing the Similac product." (Id. at ¶ 107.) She
also alleges that she purchased contaminated Similac "from lot
number 89240T20." (Id. at ¶ 38.) She does not specifically allege
that this lot was recalled, but that is the clear import of her
allegations. A plaintiff cannot decline a refund and then sue to
recover the purchase price. Cf. Holstein v. City of Chicago, 29
F.3d 1145, 1147 (7th Cir. 1994) ("Grove may not spurn this offer of
all the damages he is owed and proceed to trial."). And the other
damages she claims are clearly available under the NJPLA. See
McDarby, 949 A.2d at 278 ("[T]he economic 'harm' upon which their
[NJCFA] claims are based, consisting of a loss 'deriving from'
personal physical illness, injury or death, pain and suffering,
mental anguish or emotional harm, and loss of consortium is, as in
Lead Paint, encompassed within the definition of harm set forth in
the PLA.").

In sum, we dismiss Counts I (negligence), II (strict
liability), III (intentional misrepresentation), IV (negligent

---

[5] Sinclair, which the New Jersey Supreme Court decided after Estate of
Knoster, did not squarely address this issue. The plaintiff in Sinclair sought
relief for a type of injury (medical monitoring) that did not fall within the
NJPLA's definition of "harm." Accordingly, the court did not address whether
harm to the product itself — which is expressly excluded from the NJPLA's scope
— would support a separate NJCFA claim. Cf. Estate of Knoster, 200 Fed.Appx. at
116 ("PLA cannot subsume that which it explicitly excludes from its coverage.").

misrepresentation), VI (New Jersey Consumer Fraud Act claim), and VIII (breach of implied warranty of merchantability) as subsumed by the NJPLA. Brown's unjust enrichment claim (Count IX), which is premised on the same conduct (see Second Am. Compl. ¶ 105), is likewise dismissed. See, e.g., Arlandson v. Hartz Mountain Corp., 2011 WL 2112494, *7-8 (D.N.J. May 26, 2011) (dismissing claim for unjust enrichment where the complaint's "core issue" was the harmfulness of the defendant's product).

## D. Express Warranty

Abbott concedes that the NJPLA does not subsume Brown's express-warranty claim, see N.J.S.A. § 2A:58C-1, but argues that it is nevertheless deficient. An express warranty includes (1) "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise;" and (2) "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." N.J.S.A. 12A:2-313(1)(a)-(b). Conversely, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Id. at 12A:2-313(2). As we have already discussed, many of the representations that Brown cites in her complaint are either irrelevant or puffery. (See supra n.3.) The key

allegations concern Abbott's representations about Similac's "soothing" qualities. Both parties cite <u>In re Ford Motor Co., E-350 Van Prods. Liability Litig.</u>, Civ. No. 03-4558 (HAA), 2008 WL 4126264 (D.N.J. Sept. 2, 2008) to support their arguments. In that case, the plaintiffs alleged that Ford defectively designed its E350 van with a high center of gravity, causing it to have "an unusually high rollover rate." <u>Id.</u> at *1. The plaintiffs did not allege that Ford made any specific representations concerning the risk of rollover, and the court dismissed as puffery Ford's statements that the vehicle was "very safe" and "America's Most Trustworthy." <u>Id.</u> at *3; <u>see also</u> <u>In re Toshiba Amer. HD DVD Mktg. & Sales Practices Litig.</u>, Civ. No. 08-939 (DRD), 2009 WL 2940081, *15 (D.N.J. Sept. 11, 2009) (Rejecting plaintiffs' claim that "Toshiba's tag line that its HD DVD Players were for 'Today, Tomorrow, and Beyond' created an express warranty that, essentially, Toshiba would remain in the HD DVD market forever."). But the <u>Ford</u> court concluded that the plaintiff had sufficiently alleged breach of an express warranty based upon Ford's description of the E350 as a "15-passenger van." <u>Id.</u> at *4. A fact-finder could conclude that by describing the vehicle in this way, Ford expressly warranted that the product could safely transport 15 passengers. <u>Id.</u>; <u>see also</u> <u>id.</u> at *4 ("[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury."). Abbott's representations about Similac's soothing

qualities are more specific than the vague representation that the plaintiffs challenged in <u>Toshiba</u>.  And the relationship between the alleged warranty and the harm Brown claims her child suffered is more direct than in <u>Ford</u>.  A fact-finder could conclude that Abbott promised a soothing product, and instead delivered a defective product that caused "gastrointestinal discomfort."

Abbott also argues that Brown's express warranty claim should be dismissed because she has not alleged that she provided notice to Abbott prior to filing suit.  N.J.S.A. § 12A:2-607(3)(a) provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Brown contends that this provision does not apply to claims against a manufacturer, as opposed to the immediate seller, citing <u>Cipollone v. Liggett Group, Inc.</u>, 683 F.Supp. 1487, 1492 (D.N.J. 1988).  The <u>Cipollone</u> court based its conclusion in part on the New Jersey Supreme Court's decision in <u>Santor v. A & M Karagheusian, Inc.</u>, 207 A.2d 305, 313 (N.J. 1965) (abrogated on other grounds by <u>Alloway v. General Marine Indus., L.P.</u>, 695 A.2d 264 (N.J. 1997)), which held that the UCC's predecessor statute did not require notice to a manufacturer. Abbott argues that we should disregard <u>Cipollone</u> in favor of <u>Joc, Inc. v. Exxonmobil Oil Corp.</u>, Civ. No. 08-5344 (FSH), 2010 WL 1380750, *4 (D.N.J. Apr. 1, 2010) and <u>Slack v. Suburban Propane Partners, L.P.</u>, Civ. No. 10-2548 (JLL), 2010 WL 5392845, *4-5

(D.N.J. Dec. 22, 2010). But <u>Joc</u> and <u>Slack</u>, both of which involved claims by buyers against immediate sellers, did not discuss the issue addressed in <u>Cipollone</u>.[6] And although Abbott suggests that the case is no longer good authority, it has been cited in more recent decisions for the proposition that a plaintiff need not notify a "remote manufacturer" before pursuing a claim for breach of an express warranty. <u>See</u> <u>Coyle v. Hornell Brewing Co.</u>, Civil No. 08-02797 (JBS), 2010 WL 2539386, *6 (D.N.J. June 15, 2010) ("[T]his Court has predicted more than once that the New Jersey Supreme Court would not require a buyer to give notice of breach of warranty to a remote manufacturer who is not the immediate seller under Section 2-607 before commencing suit.") (collecting cases). Even assuming that notice was required, "notice-by-lawsuit" is appropriate in some cases. <u>See</u> <u>Coyle</u>, 2010 WL 2539386, *6; <u>Strzakowlski v. General Motors Corp.</u>, No. Civ.A. 04-4740, 2005 WL 2001912, *3-4 (D.N.J. Aug. 16, 2005); <u>Cipollone</u>, 683 F.Supp. at 1498. Whether it was sufficient in this particular case is a question of fact. <u>See</u> <u>Strzakowlski</u>, 2005 WL 2001912, ("As indicated in <u>Cipollone</u>, whether this notice-by-suit was provided within a reasonable time is a question for the fact finder. Therefore, the timing question is beyond the scope of a motion to

---

[6] Abbott also cites <u>Ford</u>, which did involve a claim against a manufacturer, but that case did not construe or apply New Jersey law in deciding the plaintiffs' warranty claims. <u>See</u> <u>Ford</u>, 2008 WL 4126264, *5 n.3.

dismiss for failure to state a claim"). Abbott's motion to dismiss Count VII is denied.

**E.     The Illinois Consumer Fraud Act ("ICFA")**

As Abbott points out, the ICFA does not have "extraterritorial effect." Landau v. CNA Financial Corp., 886 N.E.2d 405, 407 (Ill. App. 2008). In Landau, an out-of-state plaintiff sued an Illinois-based insurer under the ICFA, alleging that the insurer fraudulently induced her to purchase an insurance policy. Id. at 407. The plaintiff argued that the transaction had a sufficient nexus with Illinois because, among other connections, the allegedly false and misleading advertising materials were created by the defendant in Illinois and disseminated from there. Id. at 408-09. The Landau court concluded that these activities were not specifically related to the plaintiff's individual transaction, which occurred primarily in Pennsylvania (her home State). Id. at 408 (noting that the plaintiff purchased the policy in Pennsylvania and communicated primarily with the defendant's agents in that State). There is no indication in the complaint that Brown, a New Jersey citizen (Second Am. Compl. ¶ 11), had any relevant contact with Abbott in Illinois. Indeed, Brown's response to Abbott's motion does not address Abbott's argument that the ICFA is inapplicable. Count V is dismissed.

## CONCLUSION

Defendant's motion to dismiss (30) is granted in part and denied in part. Counts I, II, III, IV, V, VI, VIII, and IX are dismissed with prejudice. Defendant's motion is denied as to Counts VII and X. A status hearing is set for October 12, 2011 at 10:30 a.m.


DATE:     September 27, 2011

ENTER:    _____

          John F. Grady, United States District Judge